**BURSOR & FISHER, P.A.**
Neal J. Deckant (State Bar No. 322946)
Stefan Bogdanovich (State Bar No. 324525)
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-mail: ndeckant@bursor.com
        sbogdanovich@bursor.com

*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| JOHN DOE, individually and on behalf of all others similarly situated,<br><br>                        Plaintiff,<br><br>        v.<br><br> MUBI, INC.,<br><br>                        Defendant. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br><u>JURY TRIAL DEMANDED</u> |

Plaintiff John Doe ("Plaintiff"), individually and on behalf of all other persons similarly situated ("Class Members"), by and through his attorneys, makes the following allegations pursuant to the investigation of his counsel and based upon information and belief, except as to allegations specifically pertaining to himself and his counsel, which are based on personal knowledge.

## NATURE OF THE ACTION

1.      Defendant MUBI, Inc., ("MUBI") is an online "global streaming service, production company and film distributor dedicated to elevating great cinema."[1]  MUBI has installed "tracking pixels" on its website.  These tracking pixels secretly and surreptitiously send consumers' viewing histories to third-party providers like Meta Platforms, Inc. ("Meta" or "Facebook") without their consent, in violation of the Video Privacy Protection Act ("VPPA") and New York General Business Law ("NY GBL") § 673.

2.      As Congress has recognized, "films are the intellectual vitamins that fuel the growth of individual thought."  S. Rep. No. 100-599, at 7 (Oct. 21, 1988) (citing Senate Judiciary Subcommittee on Technology and the Law, Hearing Tr. at 10 (Aug. 3, 1988)).  Indeed, the videos people watch can often reveal their private politics, religious views, or sexuality—in other words, their most personal and intimate details. *Id*.  In enacting the VPPA, Congress decided that this intimate information "should be protected from the disruptive intrusion of a roving eye." *Id*.

3.      The VPPA was meant to give consumers the power to "maintain control over personal information divulged and generated in exchange for receiving services from video tape service providers."  S. Rep. No. 100-599, at 8.  "The Act reflects the central principle of the Privacy Act of 1974: that information collected for one purpose may not be used for a different purpose without the individual's consent." *Id*.

4.      MUBI violated the VPPA by knowingly disclosing personally identifiable information ("PII")—including the specific videos and video services Plaintiff and Class Members

---

[1] MUBI, https://help.mubi.com/article/21-what-is-mubi#:~:text=MUBI%20is%20a%20global%20streaming,audiences%20all%20over%20the%20world (last accessed 10/19/2023).

requested and obtained—to unrelated third parties without their consent.  MUBI installed computer code on its website, called the "Meta Tracking Pixel," which tracks and records Plaintiff and Class Members' private video consumption.  Behind the scenes of many key MUBI webpages—and unbeknownst to video viewers—this code collects Plaintiff and Class Members' video-consumption history and discloses it to Meta without their consent.  Meta, in turn, uses Plaintiff and Class Members' video consumption habits to build profiles on consumers and deliver targeted advertisements to them, among other activities.

## PARTIES

5.      Plaintiff John Doe is, and has been at all relevant times, a citizen of Ohio who resides in Hamilton County.  John Doe has visited the MUBI website on his Google Chrome browser to watch videos, and was logged into his facebook.com account on that same Google Chrome browser.

6.      Defendant MUBI, Inc. is a Delaware corporation with its principal place of business at 215 Park Avenue South Fl. 12, New York, New York 10003.  Defendant MUBI Inc.'s streaming platform is used throughout United States and California, and the United States.  Defendant wishes any actions filed against it to be filed in the federal courts in Santa Clara County.

## JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under a law of the United States (*i.e.*, the VPPA).  And this Court has jurisdiction under the Class Action Fairness Act ("CAFA"), 28 U.S.C. §§ 1332(a), 1332(d)(2).  The amount in controversy exceeds $5,000,000, exclusive of interest and costs, and there are more than 100 members of the Class, and there is minimal diversity.

8.      This Court has personal jurisdiction over Defendant because it conducts substantial business within California, including the sale, marketing, and advertising of MUBI.  Furthermore, a substantial portion of the events giving rise to Plaintiff's claims occurred in this state.  Defendant also wishes any actions filed against it to be filed in the federal courts in Santa Clara County.

9.      Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this District.  In particular,

MUBI disclosed Mr. Doe's video viewing information to Meta Platforms, Inc., which resides in this District.  Defendant also wishes any actions filed against it to be filed in the federal courts in Santa Clara County.

## FACTUAL BACKGROUND

**A.     The VPPA**

10.     The origins of the VPPA begin with President Ronald Reagan's nomination of Judge Robert Bork to the United States Supreme Court.  During the confirmation process, a movie rental store disclosed the nominee's rental history to the Washington City Paper which then published that history.  With an eye toward the digital future, Congress responded by passing the VPPA.  As Senator Patrick Leahy, who introduced the Act, explained:

> It is nobody's business what Oliver North or Robert Bork or Griffin Bell or Pat Leahy watch on television or read or think about when they are home.  In an area of interactive television cables, the growth of computer checking and check-out counters, of security systems and telephones, all lodged together in computers, it would be relatively easy at some point to give a profile of a person and tell what they buy in a store, what kind of food they like, what sort of television programs they watch, who are some of the people they telephone.  I think that is wrong.

S. Rep. 100-599, at 5-6 (internal ellipses and brackets omitted).

11.     The VPPA prohibits "[a] video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider."  18 U.S.C. § 2710(b)(1).  The VPPA defines personally identifiable information as "information which identifies a person as having requested or obtained specific video materials or services from a video service provider."  18 U.S.C. § 2710(a)(3).  A video tape service provider is "any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials."  18 U.S.C. § 2710(a)(4).

12.     As Senator Patrick Leahy explained, the VPPA was particularly concerned with consumers' video transactional data being shared with unauthorized third parties:

> The trail of information generated by every transaction that is now recorded and stored in sophisticated record-keeping systems is a new, more subtle and pervasive form of surveillance.  These

'information pools' create privacy interests that directly affect the ability of people to express their opinions, to join in association with others and to enjoy the freedom and independence that the Constitution was established to safeguard.  The bill prohibits video stores from disclosing "personally identifiable information"— information that links the customer or patron to particular materials or services. In the event of an unauthorized disclosure, an individual may bring a civil action for damages.

S. Rep. 100-599, at 5-6 (internal ellipses and brackets omitted).

13.     The Senate Report for the bill further clarifies "that personally identifiable information is intended to be transaction-oriented.  It is information that identifies a particular person as having engaged in a specific transaction with a video tape service provider."  S. Rep. 100-599, at 12.

**B.     The Meta Tracking Pixel**

14.     Facebook is the largest social networking site on the planet, touting 2.9 billion monthly active users.[2]  Facebook describes itself as a "real identity platform,"[3] meaning users are allowed only one account and must share "the name they go by in everyday life."[4]  To that end, when creating an account, users must provide their first and last name, along with their birthday and gender.[5]

15.     Meta owns facebook.com, and generates revenue by selling advertising space on this website, and other applications it owns, like Instagram.[6]

---

[2] Sean Burch, *Facebook Climbs to 2.9 Billion Users, Report 29.1 Billion in Q2 Sales*, YAHOO (July 28, 2021), https://www.yahoo.com/now/facebook-climbs-2-9-billion-202044267.html.

[3] Sam Schechner and Jeff Horwitz, *How Many Users Does Facebook Have? The Company Struggles to Figure It Out*, WALL. ST. J. (Oct. 21, 2021).

[4] FACEBOOK, COMMUNITY STANDARDS, PART IV INTEGRITY AND AUTHENTICITY, https://www.facebook.com/communitystandards/integrity_authenticity.

[5] FACEBOOK, SIGN UP, https://www.facebook.com/.

[6] Mike Isaac, *Facebook's profit surges 101 percent on strong ad sales*, N.Y. TIMES (July 28, 2021), https://www.nytimes.com/2021/07/28/business/facebook-q2-earnings.html.

16.    Meta sells advertising space by highlighting its ability to target users.[7]  Meta can target users so effectively because it surveils user activity both on and *off its site*.[8]  This allows Meta to make inferences about users beyond what they explicitly disclose, like their "interests," "behavior," and "connections."[9]  Meta compiles this information into a generalized dataset called "Core Audiences," which advertisers use to apply highly specific filters and parameters for their targeted advertisements.[10]

17.    Advertisers can also build "Custom Audiences."[11]  Custom Audiences enable advertisers to reach "people who have already shown interest in [their] business, whether they're loyal customers or people who have used [their] app or visited [their] website."[12]  Advertisers can use a Custom Audience to target existing customers directly, or they can use it to build a "Lookalike Audiences," which "leverages information such as demographics, interests, and behavior from your source audience to find new people who share similar qualities."[13]  Unlike Core Audiences, Custom Audiences require an advertiser to supply the underlying data to Meta. They can do so through two mechanisms: by manually uploading contact information for customers, or by utilizing Facebook's "Business Tools," which collect and transmit the data automatically.[14]  One such Business Tool is the Meta Tracking Pixel.

---

[7] FACEBOOK, WHY ADVERTISE ON FACEBOOK,
https://www.facebook.com/business/help/205029060038706.

[8] FACEBOOK, ABOUT FACEBOOK PIXEL,
https://www.facebook.com/business/help/742478679120153?id=1205376682832142.

[9] FACEBOOK, AD TARGETING: HELP YOUR ADS FIND THE PEOPLE WHO WILL LOVE YOUR BUSINESS,
https://www.facebook.com/business/ads/ad-targeting.

[10] FACEBOOK, EASIER, MORE EFFECTIVE WAYS TO REACH THE RIGHT PEOPLE ON FACEBOOK,
https://www.facebook.com/business/news/Core-Audiences.

[11] FACEBOOK, ABOUT CUSTOM AUDIENCES,
https://www.facebook.com/business/help/744354708981227?id=2469097953376494.

[12] FACEBOOK, ABOUT EVENTS CUSTOM AUDIENCE,
https://www.facebook.com/business/help/366151833804507?id=300360584271273.

[13] FACEBOOK, ABOUT LOOKALIKE AUDIENCES,
https://www.facebook.com/business/help/164749007013531?id=401668390442328.

[14] FACEBOOK, CREATE A CUSTOMER LIST CUSTOM AUDIENCE,
https://www.facebook.com/business/help/170456843145568?id=2469097953376494; FACEBOOK,
CREATE A WEBSITE CUSTOM AUDIENCE,
https://www.facebook.com/business/help/1474662202748341?id=2469097953376494.

18.     The Meta Tracking Pixel is a piece of code that advertisers, like Defendant, can integrate into their website.  Once activated, the Meta Tracking Pixel "tracks the people and type of actions they take."[15]  When the Meta Tracking Pixel captures an action, it sends a record to Facebook.  Once this record is received, Meta processes it, analyzes it, and assimilates it into datasets like the Core Audiences and Custom Audiences.

19.     Advertisers control what actions—or, as Meta calls it, "events"—the Meta Tracking Pixel will collect, including the website's metadata, along with what pages a visitor views.[16] Advertisers can also configure the Meta Tracking Pixel to track other events.  Meta offers a menu of "standard events" from which advertisers can choose, including what content a visitor views or purchases.[17]  An advertiser can also create their own tracking parameters by building a "custom event."[18]

20.     Advertisers control how the Meta Tracking Pixel identifies visitors.  The Meta Tracking Pixel is configured to automatically collect "HTTP Headers" and "Pixel-specific Data."[19] HTTP Headers collect "IP addresses, information about the web browser, page location, document, referrer and persons using the website."[20]  Pixel-specific Data includes "the Pixel ID and cookie."[21]

## C.     MUBI and the Meta Pixel

21.     MUBI is an online "global streaming service, production company and film distributor dedicated to elevating great cinema."[22]  It has a variety of paid monthly and annual

---

[15] FACEBOOK, RETARGETING, https://www.facebook.com/business/goals/retargeting.

[16] *See* FACEBOOK, FACEBOOK PIXEL, ACCURATE EVENT TRACKING, ADVANCED, https://developers.facebook.com/docs/facebook-pixel/advanced/; *see also* FACEBOOK, BEST PRACTICES FOR FACEBOOK PIXEL SETUP, https://www.facebook.com/business/help/218844828315224?id=1205376682832142.

[17] FACEBOOK, SPECIFICATIONS FOR FACEBOOK PIXEL STANDARD EVENTS, https://www.facebook.com/business/help/402791146561655?id=1205376682832142.

[18] FACEBOOK, ABOUT STANDARD AND CUSTOM WEBSITE EVENTS, https://www.facebook.com/business/help/964258670337005?id=1205376682832142.

[19] FACEBOOK, FACEBOOK PIXEL, https://developers.facebook.com/docs/facebook-pixel/.

[20] *Id.*

[21] *Id.*

[22] *Supra* note 1.

subscriptions options, which begin with a seven-day free trial.[23]  To sign up, consumers create an account and choose a password.

22.    From the moment consumers enter MUBI's website, Defendant invites a stalker – in the form of the Meta Tracking Pixel – to follow them and carefully watch their every move.  MUBI consumers expect a movie night alone in the privacy of their own home; they do not expect to have their viewing histories recorded and sent to third parties through the use of tracking pixels.

23.    The Meta Tracking Pixel watches exactly what consumers choose to watch once they enter MUBI's library of movies.  The title of every film on MUBI is reflected in the URL of the page.  And MUBI has configured the Meta Tracking Pixel on its website to create a PageView event every time a consumer goes to the webpage page playing the video.  And the PageView invariably discloses the URL of the webpage, which contains the video title.

24.    For example, if a consumer picks the movie *Passages* from the MUBI library and loads the page including the video player, the PageView event discloses to Meta the URL of the page: https://mubi.com/en/us/films/passages-2022.  *See* Figures 1-2.  Similarly, if a consumer picks the movie *Rosie Plays Julie*, the PageView event discloses to Meta the URL of the page: https://mubi.com/en/us/films/rosie-plays-julie.  *See* Figures 3-4.  This information allows Meta to know whether a consumer has requested or obtained a specific video.

**Figure 1**



---

[23] MUBI, https://mubi.com/en/us/memberships (last accessed 10/19/2023).

1

**Figure 2**



2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

**Figure 3**



17

18

19

20

21

22

23

24

25

26

27

28

1

**Figure 4**



2
3
4
5
6
7
8
9
10
11
12

13    25.    When a visitor watches a video on MUBI while logged into Facebook, Defendant

14 compels a visitor's browser to transmit an identifying "computer cookie" to Meta called "c_user."

15 The c_user cookie contains that visitor's unencrypted Facebook ID.  When accessing the movie

16 shown above, for example, the MUBI website is configured to have the user's browser send

17 various cookies to facebook.com.  Figures 5 through 7, show a copy of the c_user cookie being

18 transmitted to facebook.com, as shown on the webpage by accessing developer tools by clicking

19 the F12 button on a keyboard.

20

**Figure 5**



21
22
23
24
25
26
27
28

**Figure 6**



**Figure 7**



26.     The c_user cookie is personally identifiable information because it contains a consumer's unencrypted Facebook ID.  A Facebook ID allows *anybody*—not just Facebook—to identify the individual consumer.  Specifically, if one types www.facebook.com/[FacebookID] into a web browser, it will load that individual's Facebook page.  For example, the c_user cookie in Figures 3-5 above is 1528550551, and www.facebook.com/1528550551 leads to the undersigned's Facebook page.

27.     The Meta Tracking Pixel transmits additional cookies to Meta.

28.     The "fr" cookie contains, at least, an encrypted Facebook ID and browser identifier.[24]  Facebook, at a minimum, uses the fr cookie to identify particular users.[25]

---

[24] DATA PROTECTION COMMISSIONER, FACEBOOK IRELAND LTD, REPORT OF RE-AUDIT (Sept. 21, 2012), http://www.europe-v-facebook.org/ODPC_Review.pdf.

[25] FACEBOOK, COOKIES & OTHER STORAGE TECHNOLOGIES, https://www.facebook.com/policy/cookies/.

29.    Without a corresponding Facebook ID, the fr cookie contains, at least, an abbreviated and encrypted value that identifies the browser.  Facebook uses this for targeted advertising.

30.    The Meta Tracking Pixel uses both first and third-party cookies.  A first-party cookie is "created by the website the user is visiting"—*i.e.*, MUBI.[26]  A third-party cookie is "created by a website with a domain name other than the one the user is currently visiting"—*i.e.*, Facebook.[27]

31.    Meta, at a minimum, uses the fr and c_user cookies to link to Facebook IDs and corresponding Facebook profiles.

32.    A Facebook ID is personally identifiable information.  Anyone can identify a Facebook profile—and all personal information publicly listed on that profile—by appending the Facebook ID to the end of https://facebook.com/.

33.    Through the Meta Tracking Pixel's code, these cookies combine the identifiers with the event data, allowing Meta to know, among other things, that a given consumer subscribed to MUBI.  And once the consumer accesses the MUBI library of videos, these identifiers also allow Meta to know exactly which particular videos a consumer has requested and obtained.[28]

34.    MUBI begins to collect this information through tracking pixels when a user first signs up for an account.

35.    Defendant discloses these identifiers so Meta can match them with a corresponding Facebook profile and link it to a subscriber's subsequent activity on MUBI.

36.    By compelling a visitor's browser to disclose the c_user and fr cookies alongside event data for videos, Defendant knowingly discloses information sufficiently permitting an ordinary person to identify a specific individual's video viewing behavior.

---

[26] PC MAG, FIRST-PARTY COOKIES, https://www.pcmag.com/encyclopedia/term/first-party-cookie. This is confirmable by using developer tools to inspect a website's cookies and track network activity.

[27] PC MAG, THIRD-PARTY COOKIES, https://www.pcmag.com/encyclopedia/term/third-party-cookie. This is also confirmable by tracking network activity.

[28] FACEBOOK, GET STARTED, https://developers.facebook.com/docs/meta-pixel/get-started.

37.     Meta confirms that it matches activity on MUBI with a user's profile.  Meta allows users to download its "off-site activity," which is a "summary of activity that businesses and organizations share with [it] about [consumers'] interactions, such as visiting [organizations'] apps or websites."[29]  The off-site activity report confirms MUBI identifies an individual's video viewing activities.

### D.     MUBI Fails to Obtain Proper Consent

38.     While MUBI has been disclosing consumers' PII to Meta, it has not properly obtained consumer consent as required under VPPA.

39.     The VPPA only allows a video tape service provider to disclose PII of a consumer to a third party "with the informed, written consent (including through an electronic means using the Internet) of the consumer that—(i) is in a form distinct and separate from any form setting forth other legal or financial obligations to the consumer."  18 U.S.C. § 2710(B)(i).  The video tape service provider must also "provide[] and opportunity, in a clear and conspicuous manner, for the consumer to withdraw on a case-by-case basis or to withdraw from ongoing disclosures, at the consumer's election."  18 U.S.C. § 2710(B)(iii).

40.     On MUBI's initial screen that a person would land on if they are not already subscribed and logged into their account, MUBI offers consumers to try a seven-day free trial of their service.[30]  Below the prominent blue box stating "GET STARTED," MUBI includes a line of text in a small font size that states: "By clicking 'Get started' you are indicating that you have read and agree to the Terms of Service and Privacy."  These hyperlinks are not reasonably conspicuous because they are buried at the bottom of a large screen, in small white font, below the much larger, blue GET STARTED button.  MUBI has done nothing to distinguish these subtle hyperlinks other

---

[29] FACEBOOK, WHAT IS OFF-FACEBOOK ACTIVITY?, https://www.facebook.com/help/2207256696182627.  As discussed there, the Off-Facebook Activity is only a "summary" and Facebook acknowledges "receiv[ing] more details and activity than what appears in your Facebook activity."  What is more, it omits "information we've received when you're not logged into Facebook, or when we can't confirm that you've previously used Facebook on that device."

[30] *Supra* note 23.

than to underline them.   And this small plain text is drowned out by the video cut-scene playing in the background of the screen.  *See* Figures 8-9.

**Figure 8**



**Figure 9**



41.     Later in the sign-up process, on the screen where consumers enter their payment information, MUBI makes a similar statement linking its "Terms & Conditions."

1

2

**Figure 10**

3



4

5

6

7

8

9

10

11

12

**Figure 11**

13



14

15

16

17

18        42.      The "Terms of Service," "Privacy," and "Terms & Conditions" sections of text are

19  hyperlinks to separate webpages containing MUBI's full Terms of Service and Privacy Policy.

20  There is no separate page entitled "Terms & Conditions."

21        43.      Within MUBI's Privacy Policy, under section four titled "Disclosing Information,"

22  MUBI states that it shares consumer's PII "with advertisers, ad servers, and ad networks (including

23  but not limited to Google Analytics, Facebook Pixel, and Facebook Offline Events) to select and

24  deliver advertising and content, and target and personalize advertising content both on our sites and

25  on selected partner sites."[31]

26

27

28  _____

[31] MUBI, https://mubi.com/en/privacy_policy (last accessed October 20, 2023).

44.     MUBI's inclusion of its practice of sharing PII to Meta is insufficient to meet the VPPA's requirement of obtaining "informed, written consent … *in a form distinct and separate from any form setting forth other legal or financial obligations to the consumer*" because it is stated within the Privacy policy and not in a separate and distinct form.  18 U.S.C. § 2710(B)(i). At no point did MUBI obtain informed, written consent in a separate and distinct form.  Instead, MUBI has buried this information within the same Privacy Policy that MUBI has drafted to meet its other legal obligations under different data privacy laws.

45.     MUBI also fails to fulfill VPPA's requirement of providing consumers with "an opportunity in a clear and conspicuous manner, for the consumer to withdraw on a case-by-case basis or to withdraw from ongoing disclosures, at the consumer's election."  18 U.S.C. § 2710(B)(iii).  At no point does MUBI give consumers the opportunity to withdraw from ongoing disclosures of their PII in a clear and conspicuous manner.  Instead, information on how to opt-out of MUBI's practice of sharing consumers' PII is buried several pages deep within its Privacy policy, at the end of section nine.[32]  Figures 12-16, below, show where in the privacy policy a consumer's ability to opt-out of the Meta Tracking Pixel collection is buried.



**Figure 15**

**Figure 16**

Facebook Pixel Advertising cookie
- Opt out
- Privacy policy

**Figure 12**          **Figure 13**          **Figure 14**

---

[32] *Supra* note 31.

1

2      46.     Even the link to the Privacy Policy is not provided in a clear and conspicuous

3   manner.  The font of the Privacy policy link is "considerably smaller than the font used in the

4   surrounding website elements" and is surrounded by "comparatively larger font used in all of the

5   surrounding text."  *See Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 856-57 (9th Cir.

6   2022); Figures 17-19.  The main visual element of the screen is the background which consists of

7   rolling clips of movies available on MUBI.  *See id.*  The movie clip visual element, along with the

8   larger font text elsewhere on the page, "naturally directs the user's attention everywhere else" but

9   the Privacy policy.  *See Berman*, 30 F.4th at 857.  Further, while MUBI includes a hyperlink to its

10  Privacy policy and underscores the word "Privacy," it deemphasizes the existence of the hyperlink

11  to the Privacy Policy by not using additional methods, such as contrasting the font color and using

12  the color blue (which usually denotes the existence of a hyperlink).  *See id.*  Notably, the Ninth

13  Circuit has held that "a web designer must do more than simply underscore the hyperlinked text in

14  order to ensure that it is sufficiently 'set apart' from the surrounding text."  *See id.* (finding that the

15  terms and conditions hyperlink, which was underscored, was a "failure to clearly denote the

16  hyperlink[]" and "fail[ed] [the] conspicuousness test").

17                                    **Figure 17**

18

19  

20

21

22

23

24

25

26

27

28

1

2

**Figure 18**

3

4

5



6

7

8

9

10

11

12

13

14

**Figure 19**

15

16

17



18

19

20

21

22

23

24

25

26

27

28

1

**E.    Experience of Plaintiff**

2        47.    Prior to creating an account with MUBI, Plaintiff John Doe created a Facebook

3    account.

4        48.    In or around March 2022, Plaintiff John Doe created a MUBI account.  Once

5    Plaintiff Doe created an account, Defendant disclosed his PII to Meta.

6        49.    Since creating a MUBI account, Plaintiff John Doe frequented MUBI to watch

7    videos on a regular basis, including within the last 2 years.

8        50.    When Plaintiff John Doe watched videos on MUBI, Defendant disclosed his event

9    data, which recorded and disclosed the video's title to Meta.  Defendant also disclosed identifiers

10   for Plaintiff Doe including the c_user and fr cookies to Meta.

11       51.    By disclosing his event data and identifiers, Defendant disclosed Plaintiff Doe's

12   personally identifiable information to Meta.

13       52.    Plaintiff Doe discovered that Defendant surreptitiously collected and transmitted his

14   personally identifiable information in October 2023.

15       53.    Meta confirmed on Plaintiff Doe's Facebook account that it had collected his

16   interactions with mubi.com—in other words, Meta confirmed it received a list of films Mr. Doe

17   requested and obtained on the website, just as a newspaper reporter received a list of dozens of

18   films Judge Bork rented from Blockbuster 35 years ago.

19                                **Figure 20**

20


28

54.     Plaintiff John Doe values his privacy and wishes to proceed with this privacy case anonymously.  He fears that the public disclosure of his video viewing history and the fact he subscribed to MUBI in connection with this lawsuit will subject him harassment, ridicule, embarrassment, and potential retaliation.

## CLASS ALLEGATIONS

55.     **Class Definition**: Plaintiff seeks to represent a class of similarly situated individuals defined as all persons in the United States who have Facebook and MUBI accounts, and viewed videos on MUBI.com (the "Class").

56.     Subject to additional information obtained through further investigation and discovery, the above-described Class may be modified or narrowed as appropriate, including through the use of multi-state subclasses.

57.     **Numerosity (Fed. R. Civ. P. 23(a)(1))**:  At this time, Plaintiff does not know the exact number of members of the aforementioned Class.  However, given the popularity of Defendant's website, the number of persons within the Class is believed to be so numerous that joinder of all members is impractical.

58.     **Commonality and Predominance (Fed. R. Civ. P. 23(a)(2), 23(b)(3))**:  There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class that predominate over questions that may affect individual members of the Class include:

> (a)     whether Defendant collected Plaintiff's and the Class's PII;
> (b)     whether Defendant unlawfully disclosed and continues to disclose its users' PII in violation of the VPPA;
> (c)     whether Defendant's disclosures were committed knowingly;
> (d)     whether Defendant disclosed Plaintiff's and the Class's PII without consent; and
> (e)     whether Defendant's conduct violates NY GBL § 673.

59.     **Typicality (Fed. R. Civ. P. 23(a)(3))**:  Plaintiff's claims are typical of those of the Class because Plaintiff, like all members of the Class, used MUBI to watch videos, and had his PII

collected and disclosed by Defendant, and had his communications recorded by Defendant, without his consent.

60.     **Adequacy (Fed. R. Civ. P. 23(a)(4))**: Plaintiff has retained and is represented by qualified and competent counsel who are highly experienced in complex consumer class action litigation, including litigation concerning the VPPA and NY GBL § 673.  Plaintiff and his counsel are committed to vigorously prosecuting this class action.  Moreover, Plaintiff is able to fairly and adequately represent and protect the interests of the Class.  Neither Plaintiff nor his counsel has any interest adverse to, or in conflict with, the interests of the absent members of the Class.  Plaintiff has raised viable statutory claims or the type reasonably expected to be raised by members of the Class, and will vigorously pursue those claims.  If necessary, Plaintiff may seek leave of this Court to amend this Class Action Complaint to include additional representatives to represent the Class, additional claims as may be appropriate, or to amend the definition of the Class to address any steps that Defendant took.

61.     **Superiority (Fed. R. Civ. P. 23(b)(3))**:  A class action is superior to other available methods for the fair and efficient adjudication of this controversy because individual litigation of the claims of all members of the Class is impracticable.  Even if every member of the Class could afford to pursue individual litigation, the court system could not.  It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed.  Individualized litigation would also present the potential for varying, inconsistent or contradictory judgments, and would magnify the delay and expense to all parties and to the court system resulting from multiple trials of the same factual issues.  By contrast, the maintenance of this action as a class action, with respect to some or all of the issues presented herein, presents few management difficulties, conserves the resources of the parties and of the court system and protects the rights of each member of the Class.  Plaintiff anticipates no difficulty in the management of this action as a class action.

**CAUSES OF ACTION**
**COUNT I**
**Violation of the Video Privacy Protection Act**
**18 U.S.C. § 2710, *et seq.***

62.     Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

63.     Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant.

64.     Defendant is a "video tape service provider" because it creates, hosts, and delivers thousands of videos on its website, thereby "engag[ing] in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4). In particular, Defendant provides a library of audiovisual material for a monthly or annual fee.

65.     Plaintiff and members of the Class are "consumers" because they have paid to watch videos on MUBI have accounts with MUBI. 18 U.S.C. § 2710(a)(1).

66.     Defendant disclosed to a third party, Facebook, Plaintiff's and the Class members' personally identifiable information. Defendant utilized the Meta Tracking Pixel to compel Plaintiff's web browser to transfer Plaintiff's identifying information, like his Facebook ID, along with Plaintiff's event data, like the title of the videos he viewed.

67.     Plaintiff and the Class members viewed videos using MUBI.

68.     Defendant knowingly disclosed Plaintiff's PII because it used that data to build audiences on Facebook and retarget them for its advertising campaigns.

69.     Plaintiff and Class members did not provide Defendant with any form of consent—either written or otherwise—to disclose their PII to third parties.

70.     Nor were Defendant's disclosures made in the "ordinary course of business" as the term is defined by the VPPA. In particular, Defendant's disclosures to Facebook were not necessary for "debt collection activities, order fulfillment, request processing, [or] transfer of ownership." 18 U.S.C. § 2710(a)(2).

71.     On behalf of himself and the Class, Plaintiff seeks: (i) declaratory relief; (ii) injunctive and equitable relief as is necessary to protect the interests of Plaintiff and the Class by requiring Defendant to comply with VPPA's requirements for protecting a consumer's PII; (iii) statutory damages of $2,500 for each violation of the VPPA pursuant to 18 U.S.C. § 2710(c); and (iv) reasonable attorneys' fees and costs and other litigation expenses.

## COUNT II
### Violation of New York General Business Law § 673

72.     Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

73.     Plaintiff Doe brings this claim individually and on behalf of the members of the proposed Class against Defendant.

74.     Defendant is a "video tape service provider" because it creates, hosts, and delivers thousands of videos on its website, thereby "engag[ing] in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials."  New York General Business Law § 672(4). In particular, Defendant provides a library of audiovisual material for a monthly fee.  Defendant also uses the videos to collect and disclose viewers' PII so it can later retarget them for advertisements.

75.     Plaintiff Doe and members of the Class are "consumers" because they have accounts with mubi.com and pay to watch videos.  New York General Business Law § 672(1).

76.     Defendant disclosed to a third party, Meta, Plaintiff Doe and the Class members' personally identifiable information.  Defendant utilized the Meta Tracking Pixel to compel Plaintiff Doe's web browser to transfer Plaintiff Doe's identifying information, like his Facebook ID, along with Plaintiff Doe's event data, like the title of the videos he requested and obtained from MUBI.

77.     Plaintiff Doe and the Class members viewed videos using mubi.com.

78.     Defendant knowingly disclosed Plaintiff Doe's PII because it used that data to build audiences on Meta and retarget him for its advertising campaigns.

79.     Plaintiff Doe and the Class members did not provide Defendant with any form of consent—either written or otherwise—to disclose their PII to third parties.

80.     Nor were Defendant's disclosures made in the "ordinary course of business" as the term is defined by the New York General Business Law § 672(2).  In particular, Defendant's disclosures to Meta were not necessary for "debt collection activities, order fulfillment, request processing, [or] transfer of ownership."  New York General Business Law § 672(2).

81.     On behalf of himself and the Class, Plaintiff Doe seeks: (i) declaratory relief; (ii) injunctive and equitable relief as is necessary to protect the interests of Plaintiff Doe and the Class by requiring Defendant to comply with New York General Business Law § 673's requirements for protecting a consumer's personal information and the contents of their video records; (iii) statutory damages of $500 for each violation of this law pursuant to New York General Business Law § 675; and (iv) reasonable attorneys' fees and costs and other litigation expenses.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff seeks a judgment against Defendant, individually and on behalf of all others similarly situated, as follows:

(a)     For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure, naming Plaintiff as a representative of the Class, and naming Plaintiff's attorneys as Class Counsel to represent the Class;

(b)     For an order declaring that Defendant's conduct violates the statutes referenced herein;

(c)     For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

(d)     An award of statutory damages to the extent available;

(e)     For punitive damages, as warranted, in an amount to be determined at trial;

(f)     For prejudgment interest on all amounts awarded;

(g)     For injunctive relief as pleaded or as the Court may deem proper; and

(h)     For an order awarding Plaintiff and the Class their reasonable attorneys' fees and expenses and costs of suit.

## **JURY TRIAL DEMANDED**

Plaintiff demands a trial by jury on all claims so triable.

1  Dated:  October 25, 2023     **BURSOR & FISHER, P.A**.

2

3             By:  */s/ Stefan Bogdanovich*
                  Stefan Bogdanovich

4             Neal J. Deckant (State Bar No. 322946)
             Stefan Bogdanovich (State Bar No. 324525)

5             1990 North California Blvd., Suite 940
             Walnut Creek, CA 94596

6             Telephone: (925) 300-4455
             Facsimile: (925) 407-2700

7             E-mail: ndeckant@bursor.com
                 sbogdanovich@bursor.com

8             *Attorneys for Plaintiff*

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28